The next case on the docket is Agenda No. 16, No. 128602, Clark-Alave v. City of Chicago. Counsel for the appellant, are you prepared to see? May it please the Court, I'm Stephen Collins and I represent the City of Chicago. The City uses street signs and pavement markings to specify which of its roadways are intended for bicycle use. There were no such signs or markings at the location of Mr. Alave's bicycle accident. Accordingly, Mr. Alave was not an intended user of the roadway and the City did not owe him a duty. Now, the appellate court's contrary decision, which relied largely on the presence of a Diddy bicycle sharing station in the vicinity of Mr. Alave's accident, is not consistent with this court's precedents. The court made clear and vowed that it determines the intended use of a roadway by looking to affirmative manifestations of municipal intent. How is authorizing this station not an affirmative manifestation of municipal intent? It's not, Your Honor, because a Diddy station, by its nature, does not designate any particular roadway as being intended for bicycle riding. And that makes them different from things like street signs and pavement markings, which are affirmative manifestations, in that they do designate specific roadways as places where the City intends bicycling. In this case, the sidewalk was prohibited from bike usage, and there was this bike rental available right in the precinct. So where would those bikes be ridden? Bikes could be ridden anywhere where bicycling is permitted. Now, Your Honor, you refer to the fact that bicycling is generally prohibited on sidewalks for adults. That shows only that bicycling is not permitted at that location. But that prohibition for that location is irrelevant to the question of whether the City affirmatively intended bicycling at the location of Mr. Alave's accident. Well, what could be the intent? You go to one of these stations, you do the rental, and you just put it in the back of your pickup truck and drive it to some other road. I mean, where else are they supposed to ride? Your Honor, a person, a Diddy user, is free to ride a Diddy bicycle on any of the many streets where bicycling is permitted. And indeed, bicycling is a permitted use on almost all City streets. In that sense, Diddy users are on similar footing to people who own their own bicycles, who likewise are free to choose whichever route they want to take to reach their destination. Counsel, can you just back up a little bit? My question is related to the City's approval of the Diddy station in this particular location. And assuming that someone comes and rents a Diddy bike, how does the person get that bike from the Diddy station to wherever they want to go? If they're not allowed to ride on the sidewalk because only kids 12 or under, they have to ride somewhere. So it seems like it makes no sense to say that it wasn't intended for bike riding on that location because the bike stand is right there. So how do you get the bike from there to wherever you want to go without riding on the street? Your Honor, here again, this is where the distinction between intended and permitted use is really important. Because a Diddy user, because bicycling is a permitted use on almost all City streets, a Diddy user is free... Is it permitted on that street right there? In this particular case? Yes. Yes, bicycling was a permitted use, but it wasn't an intended use because the City had not set aside or designated that particular roadway. So in other words, unless there is a marking where the distinction between permitted and intended for this location is escaping me. Can you explain it a little better so I can... I don't understand the distinction. It seems like a distinction without a difference for this particular location. Explain the difference to me. Could you say any cases that have defined the difference between permissive and intended? Have there been a series of cases that have defined what those terms mean? Well, Your Honor, the cases generally recognize that if a use is intended, by definition, it means it's also permitted. But a permitted use doesn't necessarily mean an intended use. And that's the situation we have here, which is that the roadway on which Mr. O'Leary was riding was a road where bicycling was permitted. And so it was perfectly lawful for him to ride his bicycle there. The City was not going to... Can you say any cases in which this Court has found a person is a permissive user but not an intended user? Yes. How have we drawn that distinction? Well, that was the case in Bough where a bicyclist was riding a bicycle on a roadway where there were no signs or pavement markings that were that kind of affirmative manifestation that the municipality in that case intended bicycle riding at that particular location. In that case as well, that bicyclist was a permitted user of that roadway, so it was lawful for that person to ride where he rode. But because the City did not affirmatively intend and affirmatively manifest that intent through street signs and pavement markings, that Mr. Bough was not an intended user of the street and the City did not owe him a duty in that case. Has the culture of cycling and the City's promotion of cycling changed since Bough? Perhaps, Your Honor. I mean, the record doesn't reflect... The limited record in this case doesn't answer that question with any precision. But to the extent that bicycling is more popular and a more common occurrence on City streets, I think that only calls out for the need for clear demarcations of areas where bicycling is actually intended. All users of the roadway, whether it's a motorist or a bicyclist, benefit from clear indications of where a municipality actually intends bicycling. So, for example, a motorist who sees a sign or a pavement marking for bicyclists will be on notice of the likelihood that there will be bicyclists in the vicinity. Are there any cases that you can point to that indicate that the only way a municipality can show intent is by pavement markings? Well, no. Your Honor, the Bough case acknowledged street signs as an additional way of indicating affirmatively manifesting intent. I think the way the Bough court put it was street signs, pavement markings, and other affirmative manifestations of intent. So, under that case, other affirmative manifestations, could that include a divvy, you know, the ordinance, because it's an affirmative act and they pass an ordinance to allow those stations to be placed where they're placed? Well, Your Honor, I don't believe there are ordinances for each specific location. To be sure, the city is involved in approving the location of each divvy station. But a divvy station by itself does not designate any particular roadway for bicycle use. It doesn't direct a divvy user to take any particular route from the divvy station. And this is especially important for municipalities because when they do make a roadway intended for bicycle riding, they are voluntarily taking on a duty to bicyclists to maintain the roadway in a condition that's safe for bicycling. The court recognized in Bough that there are various conditions of a roadway that might not pose any particular threat to motorists, but that would be dangerous to bicyclists, such as potholes or speed bumps, things of that nature. So when the city does undertake to make a roadway safe for bicycling, it's assuming a duty to take care of these conditions. And the city simply would not do that in a way that leaves it unclear to the city itself exactly how far away and where in relation to a divvy station the city needs to undertake this kind of work. The appellate court's decision in this case could not describe with any precision where exactly in the vicinity of a divvy station a duty to bicyclists exists. The court could give only vague descriptions of this area, such as the areas close to the station. That vagueness is an illustration that a divvy station by its nature does not designate any particular roadway as being intended for bicycle use. By contrast, street signs and pavement markings don't give rise to any such ambiguity because they do specifically designate particular roadways as intended for bicycle riding. Moreover, I want to emphasize that only a fraction of bicycle users in the city actually use the divvy program. There are a great many bicycle riders who own their own bicycles. Mr. Olave himself is an example of this. He was not a divvy user, but rather he was riding down the street on his own bicycle. And the city, realizing that many bicycle riders don't use divvy bicycles at all, would not seek to convey its intent through a program such as divvy that only a fraction of users of the roadway actually use. So is there a different duty of care by the city based on whether you're riding a divvy bike or riding your own bike? Well, I think a condition that could potentially be unreasonably dangerous to a divvy bicycle may be the same to a person who owns their own bicycle. But when the city does manifest its intent that any particular roadway be ridden using a bicycle, it seeks to communicate that intent through manifestations that speak to all users of the roadway, all bicyclists, all motorists, because all users benefit from having those kinds of clear demarcations. And the city would not attempt to convey its intent through something like a divvy station that is only going to be used by a fraction of bicycle riders in the city. And Mr. Olave illustrates this because at no point in his complaint does he allege that he even noticed the presence of a divvy station in the vicinity of his accident. Counsel, when the city responded to an interrogatory and indicated that there was no expectation that people who use the divvy station bikes would walk them to the nearest bike lane, how does that impact intention on behalf of the city? Sure. Yes, the city has that expectation, Your Honor, because bicycle riding is a permitted use on almost all city streets. And so the city has no reason to expect or foresee that a person will choose to walk their bike when they're in a place where bicycling is nevertheless permitted. But the mere fact that the city does not have that expectation does not indicate or suggest that the city affirmatively intended bicycle riding at any particular location, including the one where Mr. Olave fell. But speaking of that point, I want to emphasize as well that even according to the appellate court, a divvy station by itself does not give rise to a duty to bicyclists. Rather, the appellate court had to rely on two additional factors, one of which was the city's answer to this interrogatory. The other was a city ordinance that generally prohibits adults from riding on the sidewalk. Neither of those factors that the court relied on supports the court's decision because they're both irrelevant to the city's intent for the reasons that we've discussed. And with the court's indulgence, I'd just like to review my notes. If the court has no further questions at this time, I'll see you again at rebuttal. Counsel, clear something up for me. What kind of relationship does the city have with divvy? And my question is, can I just go and set up a bicycle stand and start leasing bikes without having talking with the city? I doubt that, Your Honor. I doubt it as well. Yeah. So... Yeah, the city has a contractual relationship with divvy. Divvy operates the bicycle sharing program. I believe the city owns it, but divvy operates it. But the city certainly understands that people who are riding divvy bikes and other bikes are going to be using the streets. Sure, yes, Your Honor. And they're permitting divvy to engage in this business. It's a permitted use. But you're saying even if permitted, we can't infer from that that it was intended. That's right. That's right. Whether it's a divvy bicycle or a bicycle that a person individually owns, the city's intent is the same. And that is that we intend bicycle riding only in those lanes, those parts of the roadway that the city has affirmatively indicated with street signs and pavement markings that we intend bicycle riding. And when the city enters into a contract, that's irrelevant. Yes. It's intent. For purposes of Section 3102A, yes, it is relevant, Your Honor. So those who ride bikes in permitted areas do so at their own risk. That's right, Your Honor. If there are no further questions, I'll see you at rebuttal. Thank you very much. Counsel for the appellate. Good morning, Justices. Counsel, may it please the Court. My name is Aaron Fisher, and I represent Mr. Alave. The City of Chicago put itself in the bicycle rental business. As Counsel pointed out, they own these bicycles. They approve, through automatic process, where these divvy bicycle rental stations go. Apart from all that, the City is now asking me to believe that it has no intent, when it places these bicycle stations, that bicycles be rowed away from the stations in their legal means. That's just a foolish argument, excuse my bluntness. Of course the City knows that people are paying to rent these bicycles. Of course the City knows if the laws are being followed, they're not going to be riding them on the sidewalk. This is the City's owned bicycle station. Notwithstanding, when Mr. Alave rode down the road, if he looks to his left, there's a big divvy station, with divvy signs on every single bicycle in their customary colors. What other purpose can putting a bicycle rental location have at that location, other than bicycle rental? Now Counsel said something that maybe was a little telling, but he said, Mr. Alave never argued that he noticed the divvy station. It's irrelevant. Mr. Alave's what he did and didn't see is irrelevant to the City's intent, or inferred intent. Mr. Fisher, do you have a, is there some kind of reasonable radius or territory associated with the divvy station that there should be an expectation that the City would be responsible for maintaining, for bike use? Sure, well I think the Appellate Court pointed out five criteria specifically dealing with divvy, and it's important to stress, divvy has never been before this Court. Unbowed, the Court didn't have the opportunity to consider a municipality and a bike rental. But to answer your question directly, the five factors enumerated by the Appellate Court were, the areas directly around a divvy station, provided it's not by a bike lane, and this one was not. The path to and from the divvy station, and I'm sorry I'm merging the factors, but this is clearly defined in the Appellate Court's opinion. The City's claim that they can't disconcern what that means, all they have to do is read the Appellate opinion. So yes, there are clear paths to and from divvy stations that are not on bike lanes. This one happened not to be on one, and it would take you where my client went. So, if you rent a divvy bike, under the City's theory, you go on the street and you run at your own risk, right? Under your theory, if you're riding along the road and there's a divvy bike within a certain amount of feet from you, the City does owe you a divvy, correct? Yes, but what we're looking at is we're looking at... And really, I want to go back, how does that work? You know, are there signs that says, you know, obviously there are no signs that say, from here, 100 feet up ahead, there's no risk, here the City will cover you, here the City won't. I mean, how does this work? So, no, there aren't signs that would demark if you're within 100 feet of a divvy station, nor do we believe that would be appropriate. What we're saying is, to establish the City's intent, looking at Bao, Guadalajara, Van, you have to look to the nature of the area. And you're right, looking to the nature of the area does not delineate the furthest west or the furthest east, but in this particular case, the nature of the area was a bike rental business owned and operated by the City. But this is a rule that's going to apply to everybody. Of course. And I think that's what we're struggling with. If you ride down side streets, there are no divvy bike stations. So, you ride at your own risk there. Some places in the City you ride and you're riding at your own risk, some places not. I mean, isn't that the kind of patchwork kind of idea that you're talking about? And that's where I think this Court can paint a broader pen, paint with a broader pen. And by that I mean, a person who gets on a bike, and the Burns case, there's a series of cases, the Bao case. A person who gets on a bike in Chicago does so with all the advertising and all the notice that Chicago is a bicycle-friendly city. They do so with Chicago claiming to be the most bicycle-friendly city in the country. So, it is a bit odd that if you park in your alley where people keep bikes in garages and you get on your bike, that the City's duty is willful and wanton until you reach a bike lane. But this happens next to a bike rental station. It's a lot less vague than someone parking in their garage and trying to commute to a bike lane, in my thoughts, Judge. Mr. Pitcher, would you make any distinction between a divvy rental bike station and a bike rack that the City had placed? I would. I would. So, a bike rack is to facilitate someone else's use, but the divvy station is the City of Chicago making money renting out bicycles. So, if someone fell next to a bike rack, if this was next to a bike rack, I think the argument's a lot weaker than this happening next to it. Seven and a half million dollars since 2017, I believe it was. We're not talking pennies. The City's making money by putting bikes in these locations that aren't by bike racks. Excuse me, that aren't by bike lanes. So, are you... I want to be real clear on this. Are you arguing that the City has a duty to maintain every single street in the City of Chicago, or else they're exposed to liability, despite the Tort Immunity Act? No, I don't believe that's the law, and I'm not arguing for that change in law. What is the ruling that you want? I'm arguing that directly next to divvy stations, where the City has manifested its intent for bicycles to be used, purchased, rented, driven away, that that area in particular should have a duty of reasonable care. And limited to the areas cited by the Supreme Court, or excuse me, the Appellate Court, from the divvy rental station to the nearest bike lane. Had my client continued, he would have ended up on a bike lane, and that's a question of fact, but obviously that's what would have happened. So, just a couple of points. There were... one question was asked of Council about, has bicycle use increased since the previous decision in 1998? There were actually two amicus briefs filed on that topic, and bicycle riding in municipalities and municipal involvement is very different than it was in 1998. The City holds itself out as being the most bike-friendly city in the country. That started after the BAUB decision was reached, and this Court has never had the opportunity to consider a case where the municipality is actually involved in an act of business renting bicycles at a location that they say they don't intend for bicycles to be used. I believe the common sense argument is appropriate. BAUB, the Township of Wayne, was not operating a bicycle rental facility at the location of the injury. If it had, I believe the Court's ruling would be different. There is no case that says markings are the only way to delineate bike lanes. In fact, all of the cases say you have to look to the nature of the area, and that's exactly what we're asking the Court to do. We believe if the Court follows the facts in this case, it's going to establish that Mr. Allave was intended and permitted of the area that he was to be riding in. Now, the City went to great lengths to argue that when it undertakes to provide bike lanes, it does so in a manner that can't be confused, but that's not what the standard is. The standard isn't whether or not the City is undertaking raised or marked-off bike lanes at other locations. The standard is what was the City's intent at this location, and at this location we argue regardless of bike lanes, the City has an express showing that it intended bicycles to be ridden and ridden away. If there are no further questions, I will yield the rest of my time. Thank you, judges. Just a couple of points, Your Honors. Mr. Fisher alluded to business and the City making money off the DV program, but he hasn't cited a single case, nor are we aware of one, where municipal revenue bears on municipal intent. But on this... The City of Chicago is openly proclaiming itself as a bike-friendly city, and is that an indication of the City's intent? No, Your Honor, it's not. And I want to bring the Court's attention to a part of the Baub opinion that bears on this point, which is that the Court recognized the tremendous cost to municipalities that would be associated with making all roadways in a reasonably safe condition for bicycling. In my view, that would just be prohibitively expensive. One thing that the Baub opinion allows municipalities to do is to channel their limited resources to making only those specific roadways that the City has designated as intended for bicycling and make those roadways in a reasonably safe condition for bicycle use. There was some talk as well about the lack of a radius around a DV station where there's no discernible boundary that a DV station gives rise to. I think that's absolutely correct. It was apparent in the appellate court's decision, because the court could not set a discrete boundary around a DV station. And moreover, any attempt to... Is there any territory, is there any amount of space associated near or in the vicinity of a DV bike stand that would be considered within the intention of the City? No, Your Honor, not by virtue of the DV station itself. If the station happens to be on a bike path, then the bike path is what manifests the City's intent. Moreover, any attempt to draw a specific boundary around a DV station would just be arbitrary, because there's nothing about the DV station itself that makes a 50-foot radius the correct choice over something like a 100-foot radius or more. Last, I do want to mention the comparison we've drawn to bicycle racks. DV stations are very similar to bicycle racks in that both are conveniences to people who want to ride bicycles throughout the City. These conveniences are entirely consistent with the fact that bicycle riding is a permitted use on almost all City streets. But these conveniences are not affirmative manifestations that the City intends bicycle riding at any particular location. And if the Court has no further questions, we ask that the appellate court's judgment be reversed.  Thank you, Your Honor.